IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| REV. XIU HUI "JOSEPH" JIANG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   4:15-cv-01008 |
| | ) | |
| TONYA LEVETTE PORTER, | ) | JURY TRIAL DEMANDED |
| JAIMIE D. PITTERLE, | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| A.M., | ) | |
| N.M., | ) | |
| SURVIVORS NETWORK OF THOSE | ) | |
| ABUSED BY PRIESTS, | ) | |
| DAVID CLOHESSY, and | ) | |
| BARBARA DORRIS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

For his Complaint against all Defendants, Plaintiff Reverend Xiu Hui "Joseph" Jiang ("Fr. Joseph"), states as follows:

## NATURE OF ACTION

1.      This is a case of false accusations that have destroyed the life of a promising young man and priest.  Father Xiu Hui "Joseph" Jiang ("Fr. Joseph") fled religious persecution in his native land of China, only to face religious persecution in America in the form of unconstitutional discrimination by state officials.   Defendants A.M. and N.M. falsely and maliciously accused Fr. Joseph of sexually abusing their minor son for the crass motive of monetary gain.  Acting in conjunction with A.M. and N.M., officers Tonya Porter and Jaimie Pitterle engaged in invidious religious discrimination against Fr. Joseph under color of law, targeting him for differential treatment and selective prosecution because he is a Catholic priest.

1

Defendants SNAP, David Clohessy, and Barbara Dorris have led a shameless smear campaign in the St. Louis community against Fr. Joseph, relentlessly accusing him of molesting the same minor child, with malice and reckless disregard for the actual facts of the case. All defendants fomented and participated in a tragic rush to judgment against Fr. Joseph, and all conspired to deprive Fr. Joseph of his constitutional rights.

2.      In truth and fact, Fr. Joseph is demonstrably innocent of the accusations that the Defendants have leveled against him. The accusations were brought by a deeply troubled and unreliable 12-year-old boy at the suggestion of his abusive father. The alleged victim had made previous unfounded allegations of sexual abuse, and his parents had a history of making unfounded claims against the Catholic Church for monetary gain. Even cursory investigation would have demonstrated that the accusations were impossible, and that the alleged incidents of abuse simply did not happen. Yet state officials and the other defendants acting in concert with them subjected an innocent man to a bitter ordeal that continues to this day. There is justifiable public outrage against certain Catholic priests and officials who are guilty of child sex abuse. Such outrage, however, does not justify targeting an innocent man for invidious discrimination, baseless prosecution, and public humiliation for crimes that he did not commit.

3.      This is a civil action seeking compensatory and punitive damages, injunctive relief, and attorney's fees against Defendants for conspiring and acting under color of law to violate Plaintiff's clearly established constitutional rights under the First and Fourteenth Amendments. This action also seeks compensatory and punitive damages and attorneys' fees for claims arising under state law that form part of the same case or controversy.

## PARTIES

4.      Plaintiff Rev. Xiu Hui "Joseph" Jiang ("Fr. Joseph") is a resident of St. Louis, Missouri.  He is a practitioner of the Roman Catholic faith and an ordained priest in that faith. His race is Asian, and his nation of origin is China.

5.      Defendant Tonya Levette Porter ("Porter") is a detective of the St. Louis Metropolitan Police Department.  At all times relevant to this Complaint, Porter was employed as a police officer in and for the City of St. Louis, Missouri.  Porter is sued herein in an individual capacity.

6.      Defendant Jaimie D. Pitterle ("Pitterle") is an officer of the St. Louis Metropolitan Police Department.  At all times relevant to this Complaint, Pitterle was employed as a police officer in and for the City of St. Louis, Missouri.  Pitterle is sued herein in an individual capacity.

7.      Defendants Porter and Pitterle are referred to herein collectively as the "Police Defendants."

8.      Defendant the City of St. Louis, Missouri, is a home-rule charter city under the laws of Missouri that acts by and through the St. Louis Metropolitan Police Department and the St. Louis Metropolitan Police Department's individual police officers.

9.      Defendant A.M. is a resident of St. Louis, Missouri.

10.     Defendant N.M., a.k.a. N.L., is a resident of St. Louis, Missouri.

11.     Defendants A.M. and N.M. are divorced.  They are the biological parents of a minor son ("Minor").  A.M. and N.M. are identified by their initials herein, and Minor is identified by a moniker, to protect the identity of Minor.

12.     Defendant Survivors Network of Those Abused by Priests ("SNAP") is a nonprofit corporation created under the laws of Illinois with its principal place of business in

Chicago, Illinois.  SNAP has been registered to do business in Missouri as a foreign nonprofit corporation since 2004.

13.     Defendant David Clohessy is a resident of St. Louis, Missouri.  He serves as the Executive Director of SNAP.

14.     Defendant Barbara Dorris is a resident of St. Louis, Missouri.  She serves as the registered agent for SNAP in Missouri.

15.     Defendants SNAP, Clohessy, and Dorris are referred to herein collectively as the "SNAP Defendants."

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction of this action under 28 U.S.C. § 1343, because this is a civil action to redress the deprivation under color of law of rights, privileges, and immunities secured by the Constitution and laws of the United States.

17.     This Court has original jurisdiction of this action under 28 U.S.C. § 1331, because Plaintiff brings claims arising under federal law, namely 42 U.S.C. § 1983 et seq.

18.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, because they are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the action occurred in this District.

## COMMON ALLEGATIONS

**A. Fr. Joseph Fled Religious Persecution in China to Come to the United States.**

20.     Plaintiff Rev. Xiu Hui "Joseph" Jiang ("Fr. Joseph") was born and raised in China.  His ethnicity and national origin are Chinese.

21.     Fr. Joseph professes the Roman Catholic faith.  Since 2010, he has been an ordained Catholic priest in the Archdiocese of St. Louis.

22.     In 2000, Fr. Joseph became a Catholic seminarian in China, where the Catholic faith is a minority persecuted group.

23.     In 2006, Fr. Joseph was forced to flee China after he organized a group of seminarians in a protest against the Communist Government's policy toward the Catholic Church in China.  Certain seminarians who participated in this protest organized by Fr. Joseph disappeared without explanation.  The Catholic Church arranged for Fr. Joseph to escape from China to avoid government persecution.

24.     In 2006, after escaping China, Fr. Joseph came to the United States to complete his seminary studies for the Catholic priesthood in the United States.

25.     The United States Government subsequently granted Fr. Joseph religious asylum. Fr. Joseph is a lawful permanent resident of the United States.

**B. A.M. and N.M. Falsely and Maliciously Accused Fr. Joseph of Molesting Their Son For the Sake of Monetary Gain.**

26.     In or around 2009 and 2010, A.M. and N.M. demanded money and threatened to sue the Archdiocese of St. Louis over alleged mistreatment of their son at Central Catholic St. Nicholas School.  Their threat of litigation related to an incident in which A.M. physically assaulted the principal of Central Catholic St. Nicholas School by choking him or her.  Pursuant

to settlement, Minor transferred to St. Louis the King School, and A.M. agreed not to enter school property or approach any school personnel without prior authorization.

27.     On or about September 16, 2013, A.M. sent a demand letter to the principal of St. Louis the King School, accusing the school of failing to protect Minor from bullies at the school and accusing the school of failing to comply with anti-bullying laws.  The letter made no mention of Fr. Joseph and no mention of any alleged sexual abuse of Minor.

28.     On information and belief, A.M. has a history of physical and verbal abuse toward his son, Minor.  Minor has reported that A.M. physically abused him on multiple occasions.

29.     On or about April 15, 2014, A.M. reported to the St. Louis Metropolitan Police Department that Minor had been molested by a priest two years previously when he had been a fourth grader at St. Louis the King School at the Cathedral Basilica of St. Louis.  A.M. claimed that the abuse had occurred in 2011 or 2012.

30.     According to the statements of A.M. and/or Minor, Minor never claimed that he had been sexually abused until his father suggested it to him, after Minor told his father that he believed that he was gay.  According to Minor, his father A.M. "hates" gay people and would go "beserk" if he believed Minor was gay.  Accordingly, Minor had a powerful motive to agree with his abusive father's suggestion that Minor had been molested as an explanation of his feelings.

31.     Minor has never had any personal acquaintance with Fr. Joseph, and he could not identify Fr. Joseph's name when he made the allegation.  On information and belief, Minor identified Fr. Joseph based on public news reports about Fr. Joseph.

32.     A.M. and N.M. knew, had reason to know, and/or recklessly disregarded the fact that their son's allegations of sexual abuse by Fr. Joseph were false and unreliable.

6

33.    On information and belief, A.M. and N.M. pursued the false allegations against Fr. Joseph for the sake of pecuniary gain.

34.    On information and belief, A.M. and N.M. deliberately targeted Fr. Joseph for false accusation because he was a Catholic priest, and they believed that their allegations of child sexual abuse would be deemed more credible (and lucrative) against a Catholic priest, due to public outrage about sexual abuse by Catholic priests.

35.    On information and belief, A.M. and N.M. deliberately targeted Fr. Joseph for false accusation because he is a Chinese national who is easily identifiable among Roman Catholic priests in the City of St. Louis.   On information and belief, Fr. Joseph is the only Chinese priest in the City of St. Louis.

36.    On September 19, 2014, attorneys for N.M. and Minor sent a letter to the Archdiocese of St. Louis discussing monetary payment based on Minor's allegations.

**C. The Police Defendants Targeted Fr. Joseph for Selective Arrest and Prosecution Because He Is a Catholic Priest and Chinese National.**

37.    At all times relevant to this Complaint, Defendants Porter and Pitterle were acting under color of law as officers of the St. Louis Metropolitan Police Department.

38.    On or about April 15, 2014, A.M. reported to the St. Louis Metropolitan Police Department that his son, Minor, had been sexually abused at St. Louis the King School.

39.    On or about April 15, 2014, Defendant Pitterle interviewed Minor about his allegations of sexual abuse.   During the course of the interview, Pitterle suggested to Minor through a leading question or questions that the priest had performed oral sex on him.   On information and belief, Minor never alleged that anyone had performed oral sex on him, or performed any other abuse beyond touching him with the hands, until it was suggested to him by Pitterle.

40.    In his April 15, 2014 interview with Pitterle and thereafter, Minor identified his alleged abuser by referring to his race and national origin, repeatedly referring him as "Chinese" or "Asian," and as having "slanty eyes."

41.    Based on her April 15, 2014 interviews with A.M. and his son, Minor, Pitterle was aware that there had been no contact between Minor and the alleged abuser for at least two years, and there was no imminent prospect of any contact between them.

42.    On or about April 16, 2014, a forensic interview of Minor was conducted at the Children's Advocacy Center in St. Louis, Missouri.  Defendant Porter attended and observed the forensic interview.

43.    During the forensic interview, Minor stated that he had been sexually abused on two occasions by a priest after Wednesday Mass at the Cathedral Basilica, during his fourth-grade year at St. Louis the King School.  He alleged that the priest had "pulled him out of line" and taken him to a bathroom in the Basilica to sexually abuse him.  He alleged that the priest had walked him back to his classroom after the abuse.  He alleged that his fourth-grade teacher was aware that the priest had pulled him out of line.

44.    During the forensic interview, Minor repeatedly stated that he did not wish to provide details about the alleged abuse, in a manner strongly suggesting that he had been "coached" not to provide details.

45.    During the forensic interview, Minor repeatedly stated that his abuser was of Asian ethnicity, including when it was not responsive to the interviewer's questions.

46.    During the April 15, 2014 interview with Pitterle, and during the April 16, 2014 forensic interview, Minor repeatedly stated that he had seen his alleged abuser in the news in connection with other allegations of sexual abuse.

8

47.     During the forensic interview on April 16, 2014, Minor refused to view a photo array.

48.     Later that evening, on April 16, 2014, N.M. contacted Defendant Porter and notified her that Minor was now willing to view a photo array.

49.     On or about April 17, 2014, Fr. Joseph participated in an interview with Porter in the presence of counsel.  Fr. Joseph exercised his constitutional right to have counsel present during questioning.  During the interview, on advice of counsel, Fr. Joseph exercised his right to remain silent and declined to discuss the substance of Minor's allegations.

50.     On April 17, 2014, immediately after the interview in which Fr. Joseph invoked his constitutional rights to counsel and to remain silent, Defendant Porter arrested Fr. Joseph on charges of statutory sodomy, among others.  This arrest occurred on the second day after the first report of abuse to the St. Louis Metropolitan Police Department.

51.     After his arrest, Fr. Joseph was held in custody until he was released on bond in the evening of April 18, 2014.

52.     April 17 and 18, 2014, fell on Holy Thursday and Good Friday, which are significant religious holidays in Fr. Joseph's Catholic faith.  Fr. Joseph spent Holy Thursday and Good Friday in police custody on false charges of child sexual abuse.

53.     On April 18, 2014, Porter applied for and received warrants against Fr. Joseph, charging him with two counts statutory sodomy, based on Minor's allegations alone and no corroborating evidence.

54.     At the time they arrested and brought charges against Fr. Joseph, Porter and Pitterle knew and/or had reason to believe that the following:

a.  Minor first made the claim of sexual abuse at St. Louis the King School when he was in fear of violent reaction after revealing that he might be gay to his abusive father, who "hates" gay people and goes "beserk";

b.  Minor had a powerful motive to agree with his father's suggestion that he had been sexually abused, because he feared his father's violent animus against gay people;

c.  Minor never stated that he had been sexually abused at St. Louis the King School until it was suggested to him by his father;

d.  Minor never stated that anyone had performed oral sex on him, or performed any action other than touching with the hands, until it was suggested to him by Pitterle;

e.   Minor had identified, as his abuser, a previously accused cleric whom he had seen on television and/or in the newspapers, and who was therefore a natural target for a false accusation;

f.  Minor had made at least one unfounded allegation of sexual abuse in the past;

g.  Minor had given a statement in the forensic interview that appeared both evasive and coached; and

h.  Minor refused to view a photo array during the forensic interview, and agreed to view it only later the same day, allowing enough time to re-familiarize himself with Fr. Joseph's appearance from internet reports.

55.   On information and belief, prior to arresting Fr. Joseph, the Police Defendants conducted no additional investigation of Minor's allegations other than the steps described above, even though the allegations were wholly unsubstantiated.

10

56.     On information and belief, the failure of the Police Defendants to conduct any substantial investigation before arresting and charging Fr. Joseph contrasts starkly with the St. Louis Metropolitan Police Department's investigative practices in other cases involving unsubstantiated allegations of sexual abuse against children, where there is no immediate prospect of contact between the alleged victim and accused during investigation.

57.     If the Police Defendants had conducted additional investigation before arresting Fr. Joseph, such investigation would readily have revealed the following facts, among others:

    a.  A.M. and N.M. had a history of making unfounded allegations against the Catholic Church in St. Louis for the sake of monetary gain;

    b.  Minor came from a troubled family background, due to violent and prolonged strife arising from his parents' divorce;

    c.  Minor was a mentally and emotionally troubled child;

    d.  A.M. had a history of reported verbal and physical abuse toward Minor;

    e.  Minor's fourth-grade teacher indicated that Minor was a serial exaggerator to the point of being "delusional";

    f.  Minor had previously made allegations of sexual abuse that had been determined unfounded;

    g.  Minor's fourth-grade teacher believed that there was no way that Fr. Joseph was ever left alone with any of the students of St. Louis the King school, including Minor;

    h.  Minor's fourth-grade teacher stated that it was virtually impossible that a priest had taken him out of line in the Cathedral Basilica to sexually abuse him during or after Mass;

i.   Minor claimed that the priest had sexually abused him in the Cathedral bathroom during or immediately after 8:00 a.m. services, which typically last about 30 minutes, but the bathroom in the Cathedral Basilica remains locked until 9:00 a.m. on Wednesdays;

j.   Minor claimed that the priest abused him after 8:00 a.m. Mass in the Cathedral, but that Mass is attended by numerous other parishioners who would have witnessed the priest escorting the boy away from his class;

k.   Minor claimed that his fourth-grade teacher knew that the priest had pulled him out of line during Mass on two occasions, but the teacher categorically denied that this ever happened;

l.   Minor claimed that Fr. Joseph had brought him back to his classroom the school from the Cathedral after the alleged incidents of abuse, but this would have been impossible to do without being seen by the full-time receptionist on duty at the school entrance;

m.   No corroborating evidence existed to support Minor's allegations; and

n.   Fr. Joseph was willing to submit to a voluntary polygraph examination to substantiate his denial of the allegations.

58.   The Police Defendants failed to conduct any meaningful investigation and initiated a baseless prosecution against Fr. Joseph because he is a Roman Catholic priest. They targeted him for selective prosecution because of discriminatory animus against Catholic priests, which was fueled by public outrage at the publicized misdeeds of other priests.

59. By arresting and charging Fr. Joseph, the Police Defendants knowingly and deliberately subjected him to a lengthy ordeal of the long pendency of his criminal prosecution, despite the fact that he was demonstrably innocent.

60. The Police Defendants continued to maintain their baseless prosecution of Fr. Joseph long after further investigation demonstrated that he was innocent. In so doing, they were motivated by animus against Fr. Joseph because he is a Catholic priest.

61. On information and belief, in launching and maintaining the baseless prosecution of Fr. Joseph, the Police Defendants acted in collusion with, with the approval of, and/or pursuant to decisions made by supervisors within the St. Louis Metropolitan Police Department and/or others in positions of policy-making responsibility and authority in the City of St. Louis.

62. The criminal case against Fr. Joseph remained pending from April 17, 2014 until June 17, 2015. The case was voluntarily dismissed shortly before trial.

**D. Fr. Joseph Passed a Polygraph Examination With a High Degree of Confidence.**

63. On July 17, 2014, Fr. Joseph voluntarily submitted to a polygraph examination regarding the accusations against him.

64. Prior to submitting to the polygraph examination, Fr. Joseph agreed in advance, in writing, that the results of the polygraph examination would be shared with St. Louis Metropolitan Police Department and the prosecutors, regardless of the examination's outcome.

65. The polygraph examination was conducted by polygraph examiner who is a 38-year veteran of St. Louis Metropolitan Police Department and who was trained in polygraph examination techniques by that police department.

66. The polygraph examination lasted nearly two hours. During that time, the polygraph examiner repeatedly asked Fr. Joseph whether he was guilty of sexually abusing

Minor.  Fr. Joseph unequivocally denied sexually abusing Minor.  He also unequivocally denied committing any other kind of sexual misconduct toward any other alleged victim.

67.    During the polygraph examination, Fr. Joseph did not display physiological events associated with deception.

68.    The polygraph examiner formed the opinion that Fr. Joseph was telling the truth, and that he indicated no deception.

69.    On information and belief, during times relevant to this Complaint, the Police Defendants and the City of St. Louis had and have a policy, pattern, and practice of permitting criminal defendants who maintain their innocence in the face of unsubstantiated allegations to take polygraph examinations.  If such a defendant passes the polygraph examination, the City of St. Louis drops the charges against that defendant.

70.    The Police Defendants did not offer Fr. Joseph the opportunity to take a polygraph examination before or after arresting and prosecuting him.  Fr. Joseph voluntarily arranged to take a polygraph examination of his own accord.

71.    The results of Fr. Joseph's polygraph examination were disclosed to the Police Defendants and the City of St. Louis.  On information and belief, the Police Defendants and the City of St. Louis did not dismiss the charges against Fr. Joseph as a result of the polygraph examination.  The charges were not dismissed until eleven months after the polygraph results were reported to the police and the City of St. Louis.

72.    On information and belief, by refusing to offer Fr. Joseph the opportunity to take a polygraph examination during the investigation, and by failing to dismiss the charges against Fr. Joseph once he had passed a polygraph examination, the City of St. Louis and the Police Defendants treated Fr. Joseph less favorably than other similarly situated criminal defendants.

14

73.     The City of St. Louis and the Police Defendants treated Fr. Joseph differently than other similarly situated persons in several ways, including but not limited to:

    a.   Failing to conduct any meaningful investigation other than interviewing Minor and his parents, even though there was no immediate threat to Minor at the time of the allegations;

    b.   Refusing to dismiss charges against Fr. Joseph after investigation and witness interviews revealed that Minor's allegations were demonstrably false;

    c.   Retaliating against Fr. Joseph for exercise of his rights secured under the U.S. Constitution and other sources of law, when other similarly situated defendants were not so retaliated against;

    d.   Refusing to offer Fr. Joseph the opportunity to take a polygraph examination, when that opportunity had been offered to similarly situated defendants;

    e.   Refusing to dismiss the charges against Fr. Joseph after he had passed a polygraph examination, when charges had been dismissed against similarly situated defendants; and

    f.   Other actions of differential treatment motivated by intentional discrimination.

74.     On information and belief, this differential treatment of Fr. Joseph was motivated by invidious discrimination on the basis of religion, because Fr. Joseph is a Catholic priest.

75.     On information and belief, this differential treatment of Fr. Joseph was motivated by invidious discrimination on the basis of race and national origin, because Fr. Joseph is ethnic Chinese and comes from China.

**E. The SNAP Defendants Conducted a Defamatory Smear Campaign Against Fr. Joseph Throughout the Case.**

76.      From on April 18, 2014 through the present, Defendants SNAP, Clohessy, and Dorris engaged in a prolonged smear campaign against Fr. Joseph, making numerous public statements unequivocally asserting that Fr. Joseph had molested Minor.

77.      These statements of the SNAP Defendants were false and malicious.

78.      These statements of the SNAP Defendants were made with reckless disregard for the truth, as well as negligence and gross negligence with respect to truth.

79.      The SNAP Defendants made public statements accusing Fr. Joseph of molesting Minor in multiple venues and media.   They made statements in television interviews, in newspaper articles, in letters to the editor, in press releases and other statements on the SNAP website, in press releases and other statements on the website www.BishopAccountability.org, in public online comment forums on news websites, in public protests near the Cathedral Basilica of St. Louis, in public protests near the City of St. Louis courthouse, and in public protests at places where they believed Fr. Joseph resided.   Their statements were widely published and disseminated through television, news media, and the internet in the St. Louis community.

80.      The public statements of the SNAP Defendants were extremely damaging to Fr. Joseph's reputation.   They were calculated to inflame public opinion against Fr. Joseph, without any regard for the truth or the facts of the case.

81.      The defamatory statements of the SNAP Defendants with respect to Minor's allegations include, but are not limited to, the following examples:

> a.   On or about April 18, 2014, the day Fr. Joseph was first charged with molesting Minor, Defendant Dorris issued a press release on behalf of SNAP,

published on the SNAP website, calling Fr. Joseph a "child molesting cleric[]" and a "cunning predator."

b. On or about April 18, 2014, Clohessy stated in a press release published on the SNAP website that Minor had been "sexually violated by Fr. Joseph Jiang," and urged that Jiang should be forced to "start from scratch identifying vulnerable kids and winning their families' trust," in order to "make it harder for him to sexually assault others."

c. On or about June 2, 2014, in a broadcast television interview with Fox 2 News about Minor's allegations, Clohessy described Fr. Joseph as one of "these child predators."

d. On or about July 21, 2014, SNAP issued a press release, published on the SNAP website, that described Fr. Joseph as a "predator priest[]."

e. On or about September 25, 2014, Barbara Dorris stated in a press release published on the SNAP website that Fr. Joseph "belongs in a remote, secure, independent treatment center far away from kids and with real oversight."

f. On or about January 24, 2015, in a published letter to the editor of the St. Louis Post-Dispatch, Clohessy described Fr. Joseph as a "predator priest[]."

g. On or about June 15, 2015, SNAP published a PDF document entitled "Predator Priest Tour of St. Louis's Central Corridor," which identified Fr. Joseph as a "predator priest." This document was issued just three days before a critical hearing was scheduled in Fr. Joseph's criminal case.

h. On or about June 17, 2015, the day that the criminal charges against Fr. Joseph were dismissed, SNAP issued a statement by Dorris in a press release

17

published on SNAP's website and quoted in numerous news stories. Clohessy was listed as the chief contact person in the same press release. This press release stated that Minor and his family had been "devastated by Fr. Jiang's crimes." The release stated that Fr. Joseph had "exploited legal loopholes and used legal maneuvers to escape consequences for his hurtful and illegal misdeeds." It stated that "Fr. Jiang . . . will molest again."

i.   On or about June 17, 2015, Dorris was quoted in an Associated Press article, widely published on the internet, about the dismissal of Fr. Joseph's case. She stated that Fr. Joseph used "legal maneuvers to escape consequences for his hurtful and illegal actions."

j.   On or about June 19, 2015, in a news article about Minor's allegations published on the website of CBS St. Louis, Clohessy stated that Fr. Joseph might attempt to "flee overseas like hundreds of other predator priests have done."

82.   On information and belief, the aforesaid statements of SNAP, Clohessy, and Dorris were motivated by invidious religious bias against Fr. Joseph because he is a Roman Catholic priest.

83.   On information and belief, the aforesaid statements of SNAP, Clohessy, and Dorris were motivated by malice and the improper purpose of influencing, by adverse publicity, the jury pool in any criminal or civil trial involving Minor's allegations against Fr. Joseph.

84.   On information and belief, the aforesaid statements of SNAP, Clohessy, and Dorris were motivated by the desire to place improper pressure on the City of St. Louis and the

Police Defendants to maintain the prosecution against Fr. Joseph, even in the face of overwhelming evidence of Fr. Joseph's innocence of the charges.

85.    On information and belief, the SNAP Defendants deliberately coordinated their defamatory statements about Fr. Joseph to support, assist, encourage, and abet A.M. and N.M. in their conspiracy with the Police Defendants to deprive Fr. Joseph of his civil rights.

**F.    Fr. Joseph Has Suffered Damages Including Loss of Religious Freedom, Loss of His Priestly Ministry, Emotional Distress, Reputational Injury, Loss of Personal Liberty, Economic Damages, and Other Injuries as a Result of Defendants' Actions.**

86.    Fr. Joseph has suffered damages from the actions of all Defendants, including but not limited to loss of freedom to exercise the priestly ministry, infringement on his ability to exercise his religion freely, loss of liberty, restrictions on freedom of action, reputational injury, emotional distress, loss of sleep, loss of appetite, loss of weight, interference with his ability to apply for U.S. citizenship, economic damages, and other injuries.

87.    Fr. Joseph sincerely believes his Catholic priesthood is a vocation from God and an extremely important form of religious exercise.  This form of religious exercise is central to Fr. Joseph's identity and his aspirations in life.  He risked his life in China, and he lost his home and family there, for the sake of his vocation as a Catholic priest.  Defendants' actions have caused a lengthy suspension in Fr. Joseph's ability to serve as a Catholic priest, and have cast doubt on his ability ever to do so again.  In doing so, they have deprived him of the thing he values most in life.

88.    As of this filing, Fr. Joseph's ability to resume his priestly ministry remains in doubt, as a result of the Defendants' actions.

19

**G. The Defendants' Conduct Has Been Malicious, Reckless, Willful, and Wanton.**

89.     When engaging in the conduct described herein, the Police Defendants, A.M., N.M., and the SNAP Defendants acted with evil motive and intent, and/or with callous and/or reckless indifference to Fr. Joseph's rights, including his constitutional rights.

90.     When engaging in the conduct described herein, the Police Defendants, A.M., N.M., and the SNAP Defendants acted wantonly, willfully, and maliciously.

**COUNT ONE**
**42 U.S.C. § 1983 – Religious Discrimination**
**Against Defendants Porter and Pitterle**

91.     Paragraphs 1-90 are incorporated by reference and re-alleged herein.

92.     The Police Defendants knowingly and intentionally treated Fr. Joseph disparately, more adversely, and less favorably than other similarly situated individuals who did not share Fr. Joseph's religion and/or religious vocation.

93.     The Police Defendants treated Fr. Joseph disparately and discriminatorily because of Fr. Joseph's religion and/or religious vocation, and on the basis of discriminatory animus against Fr. Joseph's religion and/or religious vocation.

94.     The Police Defendants' actions have been taken under color of state law and have deprived Fr. Joseph of his rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

95.     As a result of the Police Defendants' acts and omissions, Plaintiff has been injured and suffered damages, including but not limited to monetary damages, loss of liberty, and emotional distress.

**COUNT TWO**
**42 U.S.C. § 1983 – Selective Enforcement Based on Religion**
**Against Defendants Porter and Pitterle**

96.    Paragraphs 1-95 are incorporated by reference as if set forth fully herein.

97.    The Police Defendants knowingly and intentionally singled out Fr. Joseph for selective enforcement of criminal laws based on his religion, *i.e.*, because of his status as a Roman Catholic and an ordained minister of that faith, and treated him differently than were other similarly situated individuals accused of similar conduct.

98.    The Police Defendants' decision to investigate and enforce criminal laws against Fr. Joseph was based on the impermissible motive of Fr. Joseph's religion.

99.    The Police Defendants acted with discriminatory intent toward Fr. Joseph, in violation of his rights under the First and Fourteenth Amendments of the U.S. Constitution.

100.    The Police Defendants' actions have been taken under color of state law and have deprived Plaintiff of his rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

101.    As a result of the Police Defendants' acts and omissions, Plaintiff has been injured and suffered damages, including but not limited to monetary damages, loss of liberty, and emotional distress.

**COUNT THREE**
**42 U.S.C. § 1983 – Selective Prosecution Based on Religion**
**Against Defendants Porter and Pitterle**

102.    Paragraphs 1 to 101 are incorporated by reference as if set forth fully herein.

103.    The Police Defendants knowingly and intentionally singled out Fr. Joseph for selective prosecution of criminal laws based on his religion, *i.e.* because of his status as a Roman

Catholic and an ordained minister of that faith, and treated him differently than were other similarly situated individuals accused of similar conduct.

104.    The Police Defendants' decision to investigate and enforce criminal laws against Fr. Joseph was based on the impermissible motive of Fr. Joseph's religion.

105.    The Police Defendants acted with discriminatory intent toward Fr. Joseph, in violation of his rights under the First and Fourteenth Amendments of the U.S. Constitution.

106.    The Police Defendants' actions have been taken under color of state law and have deprived Fr. Joseph of his rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

107.    As a result of the Police Defendants' acts and omissions, Fr. Joseph has been injured and suffered damages, including but not limited to monetary damages, loss of liberty, and emotional distress.

**COUNT FOUR**
**42 U.S.C. § 1983 – Selective Enforcement Based on Race and National Origin Against Defendants Porter and Pitterle**

108.    Paragraphs 1 to 107 are incorporated by reference as if set forth fully herein.

109.    On information and belief, the Police Defendants knowingly and intentionally singled out Fr. Joseph for selective enforcement of criminal laws based on his race and national origin, and treated him differently than were other similarly situated individuals accused of similar conduct.

110.    On information and belief, the Police Defendants' decision to investigate and enforce criminal laws against Fr. Joseph was based on the impermissible motives of Fr. Joseph's race and national origin.

22

111.    On information and belief, the Police Defendants acted with discriminatory intent toward Fr. Joseph on the basis of race and national origin, in violation of his rights under the Fourteenth Amendment of the U.S. Constitution.

112.    The Police Defendants' actions have been taken under color of state law and have deprived Fr. Joseph of his rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

113.    As a result of the Police Defendant's acts and omissions, Fr. Joseph has been injured and suffered damages, including but not limited to monetary damages, loss of liberty, and emotional distress.

**COUNT FIVE**
**42 U.S.C. § 1983 – Selective Prosecution Based on Race and National Origin**
**Against Defendants Porter and Pitterle**

114.    Paragraphs 1 to 113 are incorporated by reference as if set forth fully herein.

115.    On information and belief, the Police Defendants knowingly and intentionally singled out Fr. Joseph for selective prosecution of criminal laws based on his race and national origin, and treated him differently than were other similarly situated individuals accused of similar conduct.

116.    On information and belief, the Police Defendants' decision to investigate and enforce criminal laws against Fr. Joseph was based on the impermissible motives of Fr. Joseph's race and national origin.

117.    On information and belief, the Police Defendants acted with discriminatory intent toward Fr. Joseph on the basis of race and national origin, in violation of his rights under the Fourteenth Amendment of the U.S. Constitution.

23

118.    The Police Defendants' actions have been taken under color of state law and have deprived Fr. Joseph of his rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

119.    As a result of the Police Defendant's acts and omissions, Fr. Joseph has been injured and suffered damages, including but not limited to monetary damages, loss of liberty, and emotional distress.

**COUNT SIX**
**42 U.S.C. § 1983 – Substantive Due Process – Conduct Shocking the Conscience**
**Against Defendants Porter and Pitterle**

120.    Paragraphs 1 to 119 are incorporated by reference as if set forth fully herein.

121.    The course of conduct of the Police Defendants in discriminating against Fr. Joseph on the basis of religion, depriving him of his constitutional rights, and retaliating against him for exercise of his constitutional freedoms, was so egregious and outrageous that it shocks the conscience.

122.    In pursuing the arrest, charging, and criminal prosecution of a man whom they knew and/or should have known was innocent, and prolonging the criminal case against that innocent man as long as possible, the Police Defendants engaged in conduct that shocks the conscience.

123.    The Police Defendants' course of conduct violated and interfered with Fr. Joseph's constitutional rights to, among other things, equal protection of the laws, due process, the right to free exercise of his religion and religious vocation, his right to counsel, his right to remain silent, and his right to be free from compulsory questioning.

124.    The Police Defendants acted with the intent to harm Fr. Joseph and to deprive him of his constitutional rights.

125.    The Police Defendants' conduct described herein was not rationally related to any legitimate governmental interest.

126.    The Police Defendants engaged in this conduct under color of state law.

### COUNT SEVEN
### 42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights
### Against the Police Defendants, A.M., N.M., and the SNAP Defendants

127.    Paragraphs 1 to 126 are incorporated by reference as if set forth fully herein.

128.    The Police Defendants, A.M., N.M, and the SNAP Defendants conspired with each other with the intent to deprive Fr. Joseph of equal protection of the laws of Missouri and the United States, and equal privileges and immunities under the laws of Missouri and the United States.

129.    The Police Defendants, A.M., N.M., and the SNAP Defendants took numerous overt actions in furtherance of the object of this conspiracy, including but not limited to those set forth herein.

130.    As a result of this conspiracy, Fr. Joseph was injured in his person and property and deprived of having and exercising rights and privileges guaranteed by the Constitution of the United States, including but not limited to the right to free exercise of religion, the right to equal protection of the laws, and the right to due process of law.

### COUNT EIGHT
### Willful, Malicious, and Reckless Official Acts in Violation of Missouri Law
### Against Defendants Porter and Pitterle

131.    Paragraphs 1 to 130 are incorporated by reference as if set forth herein.

132.    The actions of the Police Defendants as set forth herein were willful, malicious, in bad faith, and/or reckless with respect to Fr. Joseph.

133.    The Police Defendants engaged in the conduct set forth herein with the intent to cause harm to Fr. Joseph, including but not limited to deprivation of his constitutional rights to freely exercise religion, to liberty, and to equal protection of the laws; reputational injury; extreme emotional pain and suffering; and other injuries.

134.    The Police Defendants acted with improper, discriminatory purposes and were conscious of the wrongful, unlawful, and unconstitutional character of their conduct.

135.    A reasonable police officer would have known that the Police Defendants' conduct was contrary to their duties.

136.    These willful, malicious, bad faith, and/or reckless acts caused injury to Fr. Joseph.

**COUNT NINE**
**Vicarious Liability**
**Against the City of St. Louis**

137.    Paragraphs 1 to 136 are incorporated by reference as if set forth herein.

138.    At all relevant times, the Police Defendants served as employees of Defendant City of St. Louis.

139.    All of the Police Defendant's conduct described herein occurred in the course and within the scope of the Police Defendant's employment with City of St. Louis.

140.    The City of St. Louis is vicariously liable for the wrongful, tortious, and unlawful conduct described herein.

## COUNT TEN
### 42 U.S.C. § 1983 – *Monell* Claim – Unconstitutional Policy and Practice
### Against the City of St. Louis

141.    Paragraphs 1 to 140 are incorporated by reference as if set forth fully herein.

142.    The Police Defendants engaged in the conduct described herein pursuant to a policy or policies prescribed, created, and/or promulgated by officials within the City of St. Louis having final authority and responsibility for making such decisions.

143.    The municipal officials that prescribed, created, and/or promulgated this policy deliberately and consciously selected this policy from among various alternatives.

144.    This policy and its selection, prescription, and implementation reflect the decision-making officials' deliberate indifference and/or gross negligence toward the constitutional rights of persons with whom the Police Defendants would come in contact with, including Fr. Joseph.

145.    This policy and its selection, prescription, and implementation directly and proximately caused the harms sustained by Fr. Joseph set forth herein.

## COUNT ELEVEN
### 42 U.S.C. § 1983 – *Monell* Claim – Failure to Train and Supervise
### Against the City of St. Louis

146.    Paragraphs 1 to 145 are incorporated by reference as if set for the fully herein.

147.    On information and belief, Defendant City of St. Louis failed to train adequately the Police Defendants and other officers regarding, among other things, impermissible discrimination on the basis of race, religion, and religious vocation; impermissible retaliation based on the exercise of constitutionally protected rights; and proper procedures and considerations relating to investigation, arrest, and other conduct.

148.    On information and belief, Defendant City of St. Louis failed to supervise adequately the Police Defendants and other officers regarding, among other things, impermissible discrimination on the basis of race, religion, and religious vocation; impermissible retaliation based on the exercise of constitutionally protected rights; and proper procedures and considerations relating to investigation, arrest, and other conduct.

149.    This pervasive failure to train and supervise the Police Defendants adequately constitutes a policy and/or custom of Defendant City of St. Louis.

150.    Defendant City of St. Louis's failure to train and supervise the Police Defendants reflected the City of St. Louis's deliberate indifference and/or gross negligence toward the constitutional rights of persons with whom the Police Defendants would come in contact with, including Fr. Joseph.

151.    Defendant City of St. Louis's failure to train and supervise the Police Defendants directly and proximately caused the harms sustained by Fr. Joseph set forth herein.

## COUNT TWELVE
### Abuse of Process
### Against the Police Defendants, A.M., and N.M.

152.    Paragraphs 1 to 151 are incorporated by reference as if set for the fully herein.

153.    The Police Defendants, A.M., and N.M. made illegal, improper, and/or perverted use of the criminal prosecution against Fr. Joseph.

154.    The Police Defendants, A.M., and N.M. acted out of improper and illegal purposes unrelated to the guilt or innocence of Fr. Joseph, including but not limited to racial animus, religious animus, desire for pecuniary gain, desire to harm Fr. Joseph's reputation, and desire to boost Defendant's reputation and/or publicity.

28

155.    As a result of the conduct of the Police Defendants, A.M., and N.M, Fr. Joseph sustained the serious harms described herein.

## COUNT THIRTEEN
### Intentional Infliction of Emotional Distress
### Against the Police Defendants, A.M., N.M., and the SNAP Defendants

156.    Paragraphs 1 to 155 are incorporated by reference as if set for the fully herein.

157.    The Police Defendants, A.M., N.M., and the SNAP Defendants intentionally and/or recklessly engaged in the conduct described herein, including but not limited to arresting and prosecuting Fr. Joseph on the basis of impermissible racial and religious animus, in violation of the United States Constitution; publicly and pervasively accused Fr. Joseph of committing abhorrent and reprehensible crimes without a reasonable belief that he had committed such crimes; depriving Fr. Joseph of his personal liberty and right to practice his religion and religious vocation freely; and other conduct.

158.    This conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

159.    The conduct of the Police Defendants, A.M., N.M., and the SNAP Defendants caused Fr. Joseph to suffer severe emotional distress, emotional and mental anguish, loss of sleep and appetite, and other harm, as described herein.

## COUNT FOURTEEN
### Defamation
### Against A.M. and N.M.

160.    Paragraphs 1 to 159 are incorporated by reference as if set for the fully herein.

161.   A.M. and N.M. disseminated, published, communicated, and elicited defamatory statements regarding Fr. Joseph, including the statements alleged herein, such as the false allegation that Fr. Joseph had engaged in unlawful conduct involving Minor.

162.   The statements made by A.M. and N.M. were defamatory in that, among other things, they accused Fr. Joseph of engaging in heinous and abhorrent conduct against a child.

163.   A.M.'s and N.M.'s statements had the tendency to harm Fr. Joseph's reputation, lower him in the esteem of the community, and deter other persons from associating or dealing with him.

164.   A.M.'s and N.M.'s defamatory statements specifically identified Fr. Joseph.

165.   A.M.'s and N.M's defamatory statements were false.

166.   Fr. Joseph is not a public figure.

167.   A.M. and N.M. knew that their defamatory statements were false, were reckless and indifferent regarding the truth of their statements, and/or were negligent regarding the truth of their statements.

168.   Fr. Joseph sustained severe and actual reputational harm as a direct result of A.M.'s and N.M.'s defamatory statements.

**COUNT FIFTEEN**
**Defamation**
**Against the SNAP Defendants**

169.   Paragraphs 1 to 168 are incorporated by reference as if set for the fully herein.

170.   The SNAP Defendants disseminated, published, communicated, and elicited defamatory statements regarding Fr. Joseph, including the statements alleged herein.

171.    The statements made by the SNAP Defendants were defamatory in that, among other things, they falsely accused Fr. Joseph of engaging in heinous and abhorrent conduct against a child.

172.    The SNAP Defendants' statements had the tendency to harm Fr. Joseph's reputation, lower him in the esteem of the community, and deter other persons from associating or dealing with him.

173.    The SNAP Defendants' defamatory statements specifically identified Fr. Joseph.

174.    The SNAP Defendants' defamatory statements were false.

175.    Fr. Joseph is not a public figure.

176.    The SNAP Defendants knew that their defamatory statements were false, were reckless and indifferent regarding the truth of their statements, and/or were negligent regarding the truth of their statements.

177.    Fr. Joseph sustained severe and actual reputational harm as a direct result of the SNAP Defendants' defamatory statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant him relief against all Defendants, including but not limited to the following relief against all Defendants:

(a)  Compensatory damages;

(b)  Punitive damages;

(c)  Injunctive and/or other equitable relief;

(d)  Costs;

(e)  Attorney's fees, including but not limited to as provided under 42 U.S.C. § 1988; and

(f)  Such other relief as the Court may deem just and proper.

31

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury as to all issues so triable in this action.

Respectfully Submitted,

*/s/ D. John Sauer*
D. John Sauer, #58721MO
7733 Forsyth Blvd., Suite 625
St. Louis, MO  63105
E-mail: jsauer@clarksauer.com
Tel:  314-332-2980

*Attorney for Plaintiff Rev. Xiu Hui "Joseph" Jiang*